Over 20 years ago, I was before this honorable court and argued the case of Pittman v. Merit when the agency refused to allow an employee to return to work because he believed he could not safely perform the physical duties of his position. The court held that placement on enforced leave pending an inquiry into his ability to work was tantamount to a suspension. But what about Perez? Judge, with regards to that case, that case is not applicable because it's factually distinguishable. Perez was out on an indefinite suspension. At the time, he had been told by his supervisor to either return to work or provide medical documentation to support his continuing being out. He never sought to come back. How is that an enforced leave? I agree with the court in that case. In that case, the employees chose not to come to work. But Mr. Brown, doesn't your case hang on the fact that on the evening of January 2 and the morning of January 3, 2008, your client reported to work and was able to work? And then when he was detected by management, he was told to leave? That's it. And you're saying that's my case. That's Pittman on the nose. He was kicked out. Absolutely. On the other hand, if one looks at that fact the way that the board did and the way the government does, you say, well, your client was a renegade. He was illegally on the property on January 2 and January 3. He snuck in. He shouldn't have been there because he had voluntarily absent himself earlier and had failed to give some indication to the government that it was safe for others to be around him if he came back. And so they said, hey, you can't stay here. So if you take that view, right, then that undermines your view. Well, if you take that view, you're saying— I'm just trying to get—isn't the nub of the case right on what I just said? Absolutely. It's January 2, 3? Absolutely. In fact, the simplest form is, my client's at work and he's told to go home. Is that a suspension? But it's a slick way to get around Perez, isn't it? Give me a round— It's a slick way to get around Perez. You call up and you say, I'm too sick to come to work. I just can't come to work. And then what you do is you slip in. Nobody sees you there. You work a little bit and you go home. And they catch you and they say, go home. Well, Judge— And bingo, bingo, you're starting to run your 14 days. There is no reason why my client could not return on that particular date. That particular date is— And why didn't he get the work certification? Well, Judge, you know, this is the interesting part about this case. And this is why the whole case is about due process. That's what this case is about. It's about due process in the sense that my client did get those documents. And according to the statement, he provided them to the supervisors and he had his doctor fax them. Now, did they get there? I don't know. But if they had given us notice and an opportunity to respond, if they had done what they actually ended up doing when they realized they had done the wrong thing, if you look at page 26 of my brief, what you will see is what they should have done in this case in the first place. What you will see is the notice of proposed enforced suspension. If they would have done that at the time, Judge, to answer your question, Judge Clevenger, if he had snuck in and done something illegal, they could take disciplinary action, suspending. They could say, you were improperly on the premises. We are suspending you for your premises. Here's your 30 days notice. Go hire Mr. Bonney. Mr. Bonney will come to his oral reply and state, no, his doctor has released him from work. But that's a pretty aggressive, almost nasty position to take. All they were saying is if you're capable of working, bring us certification. And he did. Well, when he finally did, they let him in, right? No, sir. According to him, and you have to understand, my client's an older Filipino gentleman. His first language is not English. He had a number of times miscommunications and, in fact, the board cites one of those kind of incomprehensible responses that he had. He thought he had done what was required. In fact, if you look at the record He thought he had done it before the January dates that I cited. Is that correct? On January 4th, the agency sent him a letter saying, Mr. Enrado, what's wrong with you? You need to come back to work. So he did, except he had already been there on the night of the 2nd and into the morning of the 3rd. If you look at pages 34 in the respondent's brief, 34, 35, 37, 38, 39, 42, 43, these are all statements that he got from his doctor to take in. Now, what is he doing with these statements? He's going to this orthopedic surgeon. He's going to his primary care physician. He's getting these reports to take in to say I can come back to work. And each time he said, he's told, you can't come back to work. Did you bring it in? He says, yes. They say, no. In order for you to get to Pittman and get away from Perez, you have to have a first, you have to have the government saying, get out of here or don't come. Right? And that's January, that's what happened after the January 2-3 work, right? And twice more, Your Honor. And twice more. On January 23rd, having thought that he was going to perform, and they say, well, you can't come back without the, under Perez, you can't come back without the piece of paper. Perez didn't say that. That's a misquote. I read it in both their briefs. That's not what Perez says. I just read it again. Perez, the gentleman was not working, had no intention of going back. What happened was he was switched from one form of leave to AWOL because he could not document his leave. That's what happened to Perez. There was no intent for him to go back. He was just mad because they took him off the sick leave and put him on AWOL because he failed to document the value. Yes, you can dice these cases if you wish in that respect. But on the other hand, you can look at Perez to say Perez drew a line and said it quite bluntly when it's the working person who independently makes a judgment that I'm not able to go to work. You are in a fundamentally different world than you are when the government comes and says, Mr. Bonney, go home. You can't work here. And that's exactly what happened to my client on that date. It happened to him two more times, on January 23rd and 26th. They said, you can't be here. Well, they're saying that to him because he hasn't produced in their judgment enough to show that he is not going to be unsafe to himself or someone else if he comes in the workplace. Judge, with all due respect, why does he need you? Do you think someone who calls up and says, I'm really sick, there's a lot of swine flu around my neighborhood, I'm really sick, and then they show up the next day and say, I want to work. And the government says, we're delighted to have you come in, Mr. Bonney. Just drop on somebody. Judge, believe it or not, that's the example I was going to give you. The employee against the employee. You're going to shoot yourself in the foot. You watch. I've done this before. Employee goes to the postal service and he's working and he goes home sick. He feels a little feverish, the swine flu perhaps. He goes home, goes to bed early, wakes up the next morning feeling fine and refreshed, goes to work, and his supervisor read on the front page that day, swine flu epidemic. He looks at the guy and says, were you released by the medical unit? He goes, for what? He goes, well, you went home yesterday and you were coughing. He says, I'm fine. They didn't send him home. Which is recourse. Well, that's not your case. Yes, it is. Absolutely, it's my case. He'd been absent. He'd had a bunch of absences starting in October. You made the decision to leave the workplace. What's the difference between making a decision to leave the workplace and deciding not to come if you get up in the morning and you have... That was not my hypothetical. I'm leaving early today. It's the exact same facts as my client had, except for the length of time. That's what you pointed out to me. Hey, this guy had... He had a number of absences. Also, the swine flu thing, there might be a circumstance where it would be reasonable if someone was coughing. I mean, assume God forbid we were back in the 14th century and someone came in and they started to cough and the plague was going around. I mean, that might be a reason. And Judge, if that's the case, what do you do? You say, your attendance here is a danger to yourself or to the other co-workers. Oh, no. That's the exact language this court used in Pittman 20 years ago. That's the exact language that this court said. If you believe that there's a danger to the individual, it could be dangerous to the individual or to his employees, fellow employees, you have a right to send him home. It's maintaining the order in the government. But maintaining the order in the government is a form of disciplinary action. And that's what this court said in Pittman. They said, if we are trying to protect him and his co-workers and we send him home, then the inquiry occurs. The same fellow that coughed the one time, blew it up early the day before and his supervisor now sends him home, he gets upset. What does he do? He immediately goes to his internist, gets a complete examination, he's found to be 100% healthy, comes walking in there and shows him the document. Here's my document from a board certified internist saying I'm 100% healthy. And the guy that looks at it goes, I'm not taking any chances. You've got swine flu. I know it because I saw it on the paper today. Go home. That's not our case. Your Honor, if you look at it from the standpoint of what my client's remedy is, when does he have a right to contest the action that's being taken against him? When can he say, you did get the medical documentation? What happens is this case quickly slips from the jurisdictional lens. You're slipping now into the due process issue. Right. Which is the whole basis here. Once you go past the jurisdictional lens. Right. At least you're going to hear it from the government and you're going to get a rebuttal. On the government's theory of the case, you don't get to the due process issue because the circumstances are such that once an employee decides for himself that he's not going to come to work, then you're not going to have an enforced suspension. Right. When the employee voluntarily absences himself from work, you do not have one. This is not that case. My client actually was physically at work and had work. That comes back to where we started in the beginning. If we take those two January dates off the table, then you're in the embrace of caress, I believe. Okay. And at that point, well... It is not a loving embrace, but you're there, I believe. No, sir. It's certainly not a loving embrace. But, sir, I'm not there. And the reason I'm not there is because there was no intent by Mr. Perez to ever come back. He's never said a word until he was switched from AWOL. He never voiced an intent to return to work. If you look at the case, he was just sitting at home. He was just mad because he took him off sick leave. And he said, when you put me on AWOL, now I'm going to contest it. This guy wanted to come to work. He had, according to the file that you have in front of us, six different letters from doctors, orthopedic doctors, and he repeatedly thought he was bringing them in, whether he brought them into the right place. I've told you my client was a little slow. He brought them in repeatedly, and you had those records. And what you'll see is they sent him home and said, these records are not sufficient. So he went out and got more records and came back. That's why he repeatedly came back to work on January 23rd and February 6th. He was doing everything in his power to come back. So the fundamental question is, when does he get a chance to challenge this action? Just remind me, Mr. Bynum, please. I'm sorry. I should know the answer to this. What was the total number of days when he was on the imposed suspension? It's in excess of 14, which gives the board jurisdiction. There's a discrepancy about when it is because technically he came back on February 6th, and I believe he started working again, and they sent him home. So he actually punched the clock. My position would be from January 4th when they told him when he came back the second time. That's when it started. And he finally resumed work on April 12th. April 13th he went back to work. April 12th was the last day of the enforced leave. April 13th he actually returned to work. And interestingly enough, as far as I know... You're well into your rebuttal time. Thank you very much, Your Honor. Thank you. Mr. Doyle for the board. You're going to consume ten minutes. May it please the Court. The board contends that there are two issues presented by this case. First is whether the agency properly required Mr. Honrada to provide a return to due to medical certification after a lengthy period of illness under the Family, Medical, and Leave Act. The second issue is that even if the Court were to find that there was an involuntary absence on the basis of that request, whether Mr. Honrada still managed to establish that he had met the more than 14-day requirement for board jurisdiction. The board contends that, first of all, the Family, Medical, and Leave Act requirement has not been contested by Mr. Honrada. The act, which for the Postal Service, it's the 29 U.S.C. private sector version of the Family, Medical, and Leave Act, is applicable. And it specifically authorizes that an employer may set a condition for re-employment of a medical certification as long as they have a uniformly applied practice. And in this case, the Postal Service does have, under its employee manual, has basically expressed what its policy and practice is. It's contained actually in the intervener's brief, in their appendix, excuse me, that policy. And it requires that when the agency has some concern that the employee may represent a hazard to himself or others that it can request a certification that an employee is able to return to duty after a Family, Medical, and Leave Act absence. Notwithstanding that policy, presumably you agree that if the agency comes, say, onto the work floor in the postal thing and comes up and sees Mr. Barney over there coughing and wheezing and they say, go home, then you're in Pittman. Yes, Your Honor. I'm just trying to separate the situation you're telling me. The Pittman line of cases, and actually I think it's instructive to read the Thomas case, which preceded it, because it discusses really the entire growth and development of this area of constructive suspensions. And when the Civil Service Commission, when it had the authority to review these cases, they reviewed suspensions for disciplinary reasons or when people were pending some type of inquiry. And that's kind of like the legislative. In the Thomas case, the court looked at the legislative history and said that these type of suspensions, or these type of actions, when you send an employee away because you doubt their ability to work, or doubt their ability to perform their essential functions. But that doesn't work in the cases we see here where they are lifting someone's security clearance. They send them home. Then the Pittman concept doesn't apply. I can't remember having seen an enforced 14-day suspension because they decide to pull somebody's security clearance and say go home, pending the investigation. I think whenever an agency... Is that because of a special rule in national security issues? Right. I think whenever an agency has a perception that an employee is incapable of working for some reason, security clearance, that they are really, really ill and they can't do it, and it's their initiative to start that, then the Pittman type situation applies. The board finds that. So then what do you do if Mr. Bonney says, look, he agrees with us. He said if his fellow hadn't come back to work on January 1 and 2, if I've got the dates wrong, 2 and 3, then he, in essence, said I don't have a case. He would try to make a case about the later attempts, but he'd have to realize that he was working from a predicate of a voluntary abstention from the workplace. So why doesn't he have a case? His fellow came back to work. For a couple of days he served the taxpayers and the public, and someone saw him on the job and said, hey, go home. Well, the reason why, as the administrative judge found below, is that when Mr. Henrata returned to work on January 2 and January 3, it was unauthorized. That he was required to... Does the record reflect whether at that point in time Mr. Henrata thought he had been to a doctor and had some type of pieces of paper in his hand and he thought clearly? There's no indication that Mr. Henrata presented any type of medical certification at that time. In addition, Mr. Bonney referred to documents in your exhibit, I think, page 3, 4, 5, 6. What are those? This is a certification of his health. He's a healthy fellow, right? What I'm trying to find out is whether or not any of those predated January 2 or 3. Not to my recollection, Your Honor. I don't believe there's anything to that effect. In fact, the first document after Mr. Henrata's return was a January 9th FMLA sick leave request form from Dr. Miranda, Mr. Henrata's doctor, which indicates that he is still incapacitated for duty and will be for another three weeks. Assuming that the agency can take at face value that Dr. Miranda knew what he or she was talking about, that's an indication that Mr. Henrata even prematurely returned on January 2 or 3, that the condition, which was a serious health condition under the FMLA, was resolved. He was trying to return to his original assignment? He did, yes. As opposed to a reduced effort stress assignment? That's correct. Now, there are some documents later on, from Dr. Neff, in the February time frame, where there was a request in the change and shift. However, those documents were not, like, overcome by events. Would you agree that it would be a different case? Perhaps you wouldn't, I'm not going to ask you to concede error, but if Mr. Henrata, say, on January 2 and 3 had received from somebody a piece of paper saying, you're okay to go back to work, and he somehow thought that he communicated that or something, so that would certainly take a little bit of the edge off of his, quote, unauthorized presence in the workplace on those two dates, right? It would have taken some edge off, I would agree with that. However, the agency's regulation or manual indicates that just a plain statement from a doctor saying, you can go back to work, is not enough. It has to include a certification that the employee can return to work without hazard to himself or others, and that he can perform the essential functions of his position. And we would contend that just a simple, you're okay to go back to work, is not sufficient under the policies of the agency to constitute a return to duty certification. So the agency's control, if you will, over whether one can or cannot return, right? That's, from Mr. Bonnell's point of view, in order to enforce a smooth, safe workplace. That is to be distinguished from the agency's authority to tell you to leave. See what I mean? Because you get in trouble under Pittman if you send somebody home because you think they're sick. Right. If you send someone home because you think they're sick. If you do that, that's a no-no. You're going to start an involuntary suspension that may last 14 days or more. Right. But the critical point... The fact that you control the coming back doesn't... That control doesn't count against the government. But the critical point is who is really in control of matters. And that's what Perez really instructs. And in addition, there's a case... And that's what I'm talking about, the government's control. Because Mr. Bonney can go to his doctor, and Mr. Bonney can get a piece of paper, and even his doctor can say, I think he's safe to go back to the workplace. And so he comes back, and he's board-certified, and he hands the piece of paper over, and the boss sent him home because he thought he had swine flu. And the boss says, you're not coming back. Well, in that hypothetical, I think you would have a period of constructive suspension. But in this case, what you have is just an agency having a reasonable requirement... You're saying that you don't think the government freely has the right to override a private doctor saying that Mr. Armato would present no risk to himself or to others in the workplace. No, I mean, clearly even the agency's regulation indicates that if they do not accept this medical certification from the doctor, that they have to start going through formal procedures, including a fitness for duty examination. I didn't know that. Which, you know, this is not a case where the agency was requiring like an inquiry, a fitness for duty examination. They were requiring a certification of a simple one-page form. Well, I was worried that if the government controlled the tail, if you will, if the government controlled the right to say to Mr. Armato, I'm sorry, you've got this certificate that says you're in no danger to yourself or somebody else, we don't care. You're not coming back. You're telling me that the government can't exercise that authority without consequences. If he came with the certificate that satisfied the regulation, that came from a proper board-certified doctor and whatnot, and then the agency says, we don't care, you still can't come back, they answer that without consequences. Right. Then it would have to be a more formal process. Now, just very briefly, I'd like to just touch on the fact that if you look at the medical evidence in this case as well, Mr. Armato never satisfied the more than 14-day period of absence requirement based on the medical documentation from his doctors because they continuously established... If you mark from what first date? The first date would be, well, he came back on January 2nd or 3rd. On January 9th, there's a medical documentation from Dr. Miranda saying he's unfit for duty. Mr. Armato attempted to come back on January 24th, and on January 30th, which was six days later, Dr. Armato wrote another statement. I see my time has expired, if I may just complete this. Well, finish the thought. Okay, thank you very much. On January 30th, Dr. Miranda wrote another statement finding Mr. Armato... How many days total do you get? You're saying he didn't have 14 days of absence? Never had 14 days of absence. Well, how many days did he get? He had some. I mean, just tell me what the number is. He got six days, and if we found January 3rd, he had six days. It was January 3rd to January 9th. There was a period where you would say he was not covered by a medical excuse saying he was incapacitated. Then January 24th, January 30th, six days. And then on January... Actually, each of those six is probably seven, if it's inclusive of 24 to 30. That may be true, Your Honor, yes. Yes, so seven and seven are 14. Have we held that it has to be 14 continuous days? Yes, it does. Yes, you cannot stack. Can't tack? You can't tack. And then there was... Bonnie, you're smiling. He seems to think you can't. No, I'm pretty sure for a suspension, it has to be 14 continuous days. The Board has clear law on that point. February 6th, Mr. Honrada attempted again to return, and there is February 13th return to duty from Dr. Miranda, which again says he's really incapacitated and can't... It was a return to duty certification, but it says he can't come back until March 5th. And then we have a following document from Dr. Neff, which then takes it out to April 2nd, which is when the agency acted very promptly upon receiving the documentation from Dr. Neff. Thank you, Mr. Doyle. I think you probably want to yield to Mr. Palmer. Good morning. May it please the Court. There are really two reasons why Pittman is distinguishable from this case. The first is the one that has already been discussed, and that is that in Pittman, the agency unquestionably sent the employee home from his regular duties. The agency initiated the leave. Here, in this case, Mr. Honrada was simply trying to come back from an extended period of voluntarily initiated sick leave. And, of course, the government's position is that he was unauthorized to be there. The second reason why Pittman is distinguishable from this case is that once the agency sent the employee home in Pittman, the entire duration of the leave was within the sole control of the agency. There is nothing that the employee could have done in Pittman to cut the leave short. No voluntary action. Whereas, in this case, even after the agency sent Mr. Honrada home, he certainly could have cut the leave short by obtaining a return to duty medical certification and submitting it. In fact, the facts in this case show that once Mr. Honrada obtained a return to duty medical certification, which wasn't until March 5th, he sat on it until April 2nd. He didn't submit that to the agency until almost a month later. And then when he did submit it on April 2nd, the agency acted on it within two days and returned Mr. Honrada to work. It's probably a little cruel to tax him for sitting on this for those days. I mean, by then he must have been pretty confused about what he was supposed to be doing. Well, the board found, Your Honor, that the agency sent Mr. Honrada a return to work certification, a return to work package at least four times. That's at page 21 of the intervener's appendix. Not only that, each time he came into work, the agency sat him down and explained to him the requirements for returning to work. And one time, even his union representative was there. That's at page A14 of the intervener's record. Essentially, Mr. Honrada is arguing that any time an agency sends, requires return to duty medical certification, so long as the employee takes longer than 14 days to submit the return to duty medical certification, regardless of the reasons, then the employee can sue for a constructive suspension. That would effectively nullify the right of an agency to request return to duty medical certification, which, of course, is based upon solid policy grounds. Mr. Bonney argued in his argument that Mr. Honrada claims to have submitted certain medical certification to the agency throughout his period of leave, but the board found, and Mr. Honrada is not arguing that this finding is unsupported, that Mr. Honrada, in fact, did not obtain return to duty medical certification until March 5th. And you agree with your colleague from the board that even if he was being forced to stay away from work, it's harmless error because there's no consecutive 14-day period? That's right. And the law on that, the Federal Circuit hasn't spoken directly to that, but it's clear that in the MSPB, there has to be 14 consecutive days, unless, one, the suspensions are based on the same reason. I know that that is what is contemplated by the way in which the stat regulations are written, but what happens if some agency figures they've got a real cool way to keep Bonney out of here? Right. So they have him 13 days, and they let him back, and then they kick him out another 13. And that's actually, Your Honor, the second time in which suspensions don't necessarily have to be constructive. The MSPB in Stanton versus the Department of Transportation, 109 MSPR 485, 2008, said the second time that suspensions do not have to be consecutive is when there's evidence that the agency attempted to circumvent board jurisdiction by imposing multiple suspensions of 14 days or less. There's no evidence of that here. Mr. Honrada hasn't argued that. Moreover, one factor in determining whether that is the case is to looking to whether the agency even considered the leave to be a suspension in the first place. And, of course, there's no evidence of that either. The board, I just want to make one final point. The board might have had jurisdiction in this case if, after Mr. Honrada submitted his return to duty medical certification on April 2nd, and the agency took longer than 14 days to act upon the medical certification and return to work. That's not what happened. Here it took two days for the agency to do that. For those reasons and the reasons expressed in my brief, I respectfully request the court to approve the board's decision. Thank you, Mr. Palmer. Mr. Bonney has little time to reply. Thank you very much, Your Honor. It's much ado about nothing unless you've got 14 consecutive days in this case, isn't it? Well, Your Honor, you can't go with those medical documents because what the agency said was go back and get more medical documentation. It was confusion because my client would explain to them that he needed to be covered, and they would write him out again because the doctor said, well, if your agency doesn't want you, then I'm going to write the medical certificate. He starts a kick-out date. He starts a Pittman date each time he comes back. It may be a very sad case that your client didn't know what he was doing, but he triggers Pittman each time he comes back, and it's all to go home, in your theory. You never get 14 days. If you look at one of those medical slips, actually one of the doctors said, I'm putting him out of work again because of his orthopedic doctor, Dr. Neff. Dr. Neff had released him in 2007, a year earlier. Mr. Bonney, you've got to get your 14 days. I got them. I absolutely have 14 days. 14 days in a row. Yes, sir. There's an old, old case that talks about that. That's why I was snickering, because there's an old case that says, hey, if you want to, every 13 days you could put a guy out, like you gave the scenario. Right, but that's where you've got the agency gaining the situation. Your Honor, if we had gotten notice of the accident, that's the whole thing. The confusion ends when they give us the due process rights. Your Honor, give me the start and stop dates where you get more than 14 days. Your Honor, you can't. What they're saying is that there's a medical slip that covers and says that he's not able to work. But that medical slip. Mr. Bonney, you know perfectly well that litigation is a form of civilized combat. And your adversary has said we don't need to reach this very difficult issue of whether there was a kick out as of January 2 and 3, because even if it was, there never were any 14 consecutive days in which he was kept away from work. There are 14 days, Your Honor. I've asked you to be from what to what. From January 3rd when he reported back to work until he returned to work on April 12th, which you will see is medical leave to cover some of those absences where he was told to go get it, so he covered himself. Judge, one other thing that I would like to just say is if you look at the regulations, where we started this whole argument with your question is what if he sneaks in on unauthorized leave? If you look at the regulation on page 27 of the appendix, it does not say what they've been saying. It says the supervisor may or may not request this documentation before he allows the employee to return. They say there's a policy that requires him to provide this. That's not what this regulation or this policy says. It says return to work clearance may be required. If you're a union representative, it's required. If you're the girlfriend of the supervisor, it's not required. And when you get to situations like that that happen every day in the workforce, then that's when you have to have notice and an opportunity to respond. You have to have your 7513 rights. Give it to me in writing. I'll respond. And my client would have never been out of work. Thank you, Mr. Bonney. Thank you very much. We have your case, which we will take under advisement.